THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:08-CV-141-FL

| | |
|---|---|
| MITCHELL R. SMALL, | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| v. | ) **MEMORANDUM AND** |
| | ) **RECOMMENDATION** |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

This matter is before the Court on the parties' cross motions for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c). Claimant Mitchell R. Small ("Claimant") filed this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant that Claimant was no longer eligible for Disability Insurance Benefits ("DIB"). Claimant responded to Defendant's motion and Defendant filed a reply. Accordingly, the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, this Court recommends denying Claimant's Motion for Judgment on the Pleadings, granting Defendant's Motion for Judgment on the Pleadings and upholding the final decision of the Commissioner.

## STATEMENT OF THE CASE

Claimant filed an application for DIB on 18 August 2003, alleging disability beginning 16 August 2002. (R. 58-60). His claim was denied initially and upon reconsideration. (R. 34-37, 40-41, 56-57). A hearing before the Administrative Law Judge ("ALJ") was held on 19 May 2005, at which Claimant was represented by counsel and a vocational expert ("VE") appeared and testified. (R. 384-411). On 13 July 2006, the ALJ issued a partially favorable decision to

Claimant, granting a closed period of disability and conferring DIB for the period commencing 16 August 2002 and ending 6 April 2005. (R. 13-32). Claimant requested a review of the ALJ's decision by the Appeals Council (R. 12), contending his disability continued after 6 April 2005, and submitted additional evidence as part of his request (R. 331-39). After reviewing and incorporating the additional evidence into the record, the Appeals Council denied Claimant's request for review on 16 July 2008. (R. 6-9). Claimant then filed a complaint in this Court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner...as to any fact, if supported by substantial evidence, shall be conclusive..." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla...and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's

2

review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## DISABILITY EVALUATION PROCESS

In a typical disability case, a claimant will apply for benefits while under a continuing disability. The termination of the benefits then involves a subsequent hearing, during which the Commissioner must determine whether substantial evidence supports a finding of medical improvement in the claimant's impairment, and, if so, whether this medical improvement is related to the claimant's ability to work. 20 C.F.R. § 404.1594(a); *see also* 42 U.S.C. § 423(f). Medical improvement is defined as "any decrease in the medical severity of [the] impairment(s) which was present at the time of the most recent favorable medical decision" of disability. 20 C.F.R. § 404.1594(b)(1). The determination of "a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the] impairment(s)." *Id.* Additionally, medical improvement is related to the ability to work if the improvement results in an "increase in [the] functional capacity to do basic work activities." *Id.* § 404.1594(b)(3).

The Commissioner applies an eight-step sequential analysis in evaluating whether a claimant's DIB benefits should be terminated. *See* 20 C.F.R. § 404.1594(f). Among other factors, the steps include reassessing whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant has experienced a decrease in medical severity; (3) the claimant has experienced medical improvement related to the claimant's ability to perform work; (4) certain enumerated exceptions apply to terminate benefits even if medical improvement has not

3

occurred; and (5) the claimant's improved RFC would allow him to perform his past relevant work or other work. *Id.*

In contrast to a "continuing disability" case, a matter such as this, where benefits are awarded for a definitive time period, is traditionally referred to as a "closed period" case. *See Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir. 2002). In such cases, "the ALJ engages in the same decision-making process as in termination cases, that is, deciding . . . when[] the payments of benefits should be terminated." *Id.* Accordingly, while not addressed specifically by the Fourth Circuit, other courts have held that the medical improvement standard applies also to closed period cases. *See id.* at 719-20; *Shepherd v. Apfel*, 184 F.3d 1196, 1198 (10th Cir. 1999); *Jones v. Shalala*, 10 F.3d 522, 523-24 (7th Cir. 1993); *Pickett v. Bowen*, 833 F.2d 288, 293 (11th Cir. 1987); *Chrupcala v. Heckler*, 829 F.2d 1269, 1274 (3d Cir. 1987); *McDaniel v. Astrue*, No. 1:07-CV-779, 2009 WL 929555, at*3 n.3 (M.D.N.C. Apr. 3, 2009); *Briley v. Barnhart*, 4:05-CV-132-BO, Slip Op. at 4 (E.D.N.C. Jun. 21, 2006). Additionally, Social Security Rulings have cited the medical improvement regulations as appropriate guidelines in determining when a disability period has "closed." *See* Soc. Sec. Rul. ("S.S.R.") 02-1p, 2000 WL 628049, at *10 n.2. (Sept. 12, 2002). Finally, the parties concede that the medical improvement standard applies to the decision to "close" a period of benefits. *See* Pl.'s Mem. in Supp. of Pl.'s Mot. for J. on the Pleadings at 18. ("Pl.'s Mem."); Def.'s Mem. in Supp. of Def.'s Mot. for J. on the Pleadings at 3 ("Def.'s Mem.").

In this case, Claimant alleges the following errors by the ALJ: (1) failure to support the finding of medical improvements resulting in the RFC to perform light work with substantial evidence; and (2) failure to rely upon the testimony of the VE. *See* Pl.'s Mem. at 16, 24.

4

## FACTUAL HISTORY

### I.    ALJ's Findings

The ALJ granted Claimant a closed period of disability covering 16 August 2002 through
6 April 2005 and found Claimant had not engaged in substantial gainful activity at any time
relevant to his decision. (R. 19, 23). The ALJ found further that during the closed period,
Claimant suffered from the following severe impairments, though none of the impairments,
alone or in combination, was found to meet or equal any listed impairment: (1) a history of facial
injury and fracture; (2) degenerative joint disease of the right shoulder; (3) degenerative joint
disease and a history of fracture of the ankle; (4) lowered cognitive functioning with a history of
closed head injury; (5) anxiety; and (6) major depressive disorder. (R. 20). The ALJ also
determined that Claimant's statements about the limiting effects of his symptoms during this
closed period were "generally credible," that Claimant was unable to sustain work-related
physical and mental activities in a work setting on a regular and continuing basis and that he was
unable to perform his past relevant work. (R. 21-22). Accordingly, the ALJ determined that,
during the closed period, Claimant was disabled under the Act. (R. 23).

The ALJ found that, effective 7 April 2005, Claimant experienced medical improvement
and his disability ended. *Id.* The ALJ attributed the medical improvement to "the passage of
time, treatment, surgical intervention, physical therapy, and the use of prescription medications."
*Id.* The ALJ found further that Claimant continued to suffer from the same impairments listed
above, that his statements about his symptoms were not entirely credible and that Claimant was
capable of performing light work.[1] (R. 22-23). While finding Claimant incapable of performing

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this

his past relevant work, the ALJ determined, based on testimony by a VE, that Claimant was capable of performing other jobs which existed in significant numbers in the national economy. (R. 22, 32).

## II. Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 42 years old, divorced and unemployed. (R. 391-92). Claimant attained an eleventh grade education and earned his General Educational Development credential. (R. 391). Claimant worked as a garbage truck operator until he was involved in an accident during which he was struck by a mini-van while performing his job. (R. 388).

Claimant testified that he is unable to work due to ongoing chronic pain associated with his right ankle, right shoulder and face. (R. 395-96). Claimant explained when he walks a lot, he experiences a stabbing pain in his ankle. When Claimant moves his shoulder, which often "locks up," he experiences pain in his chest and ribs. (R. 397). Claimant has ongoing medical visits for his impairments, usually visiting the doctor once or twice a month. (R. 394). Claimant experiences drowsiness and blurred vision as a result of his medications, which include Neurontin, Effexor, Endocet and Advil. (R. 393-94, 396). Claimant took Lorcet, but discontinued its use because it caused drowsiness and dizziness. (R. 394).

Claimant explained that he feels people are staring and laughing at him as a result of his scars and as such, he is incapable of socializing. (R. 395). Claimant explained further that he

category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

Case 7:08-cv-00141-FL   Document 25   Filed 06/11/09   Page 6 of 27

experiences anger problems and becomes frustrated easily. (R. 396). Claimant spends much of

his time in his room with the door locked. (R. 395). Claimant performs no household chores and

cannot drive. (R. 398-99). Following Claimant's testimony as to household chores, Claimant

explained he needed to be alone and requested the hearing proceed without him. (R. 400-01).

## III. Vocational Expert's Testimony at the Administrative Hearing

Dixon Pearsall, Ph.D., testified as a VE at the administrative hearing. (R. 52-55, 402-09).

After the VE's testimony regarding Claimant's past work experience (R. 403), the ALJ posed the

following hypothetical:

> [A]ssume that you're dealing with a hypothetical individual the same age as the
> Claimant with the same educational background and work experience . . . that this
> [] individual retains the capability of lifting 20 pounds on an occasional basis, 10
> pounds on a frequent basis, can stand, [walk and sit] six of eight hours . . . need[s]
> a sit/stand option at will. Pushing and pulling in the [lower extremity and] right
> upper extremity would be occasional . . . . Climbing would be occasional. Ropes,
> ladders and scaffolds would be never. Balancing, stooping, kneeling, crouching
> and crawling would be frequent. Reaching with the right upper extremity would
> be frequent. Overhead reaching would be occasional. This individual could do
> simple, one, two step tasks . . . [and] need[s] a low stress environment. Thus, it
> would have to be a non-production work environment . . . This individual could
> not have public contact. It would be a non-public job. Contact with co-workers
> would be occasional and really the limitation is, it could not be coordinated work
> where someone would have to sit with one or more people that have to work in
> continuous coordination with them . . . . Could such an individual perform any of
> the Claimant's past relevant work as actually performed by the Claimant or as
> generally is performed in the national economy?

(R. 403-04). The VE responded in the negative as to past relevant work but explained the

individual could perform the following light positions with a specific vocational preparation

("SVP") time of 2 and provided DOT classification citations along with the number of jobs

available in the local and national economies: (1) grader/rooter/table worker - DOT 789.687-

146, 6,000 locally, 120,000 nationally; (2) general table worker - DOT 706.687-010, 8,000

7

locally, 180,000 nationally; (3) night watchman/gate guard - DOT 279.357-054, 8,000 locally, 150,000 nationally. (R. 405). When asked about the consistency of his testimony with the DOT, the VE stated he was unaware of any conflicts but made "the qualification that the DOT doesn't reference sit/stand. So any reference to sit/stand is based on personal and professional experience." *Id.* The ALJ then asked the following hypothetical: "Hypothetical two is the same as hypothetical one. The only modification is that this individual would miss various times of various duration on a daily basis and this time could be 15 minutes one day. It could be four hours the next day. Would that affect the job base?" *Id.* The VE responded that it would eliminate all positions at all exertional levels. (R. 406).

Claimant's counsel asked the VE whether his response to the first hypothetical would be impacted if the hypothetical individual suffered from anger and impulsivity, poor social skills and an inability to interact in any manner with others. (R. 407). The VE responded that the individual would not be employable in the positions associated with the first hypothetical or any other position. (R. 408).

## DISCUSSION

### I.    The additional evidence submitted to the Appeals Council is not material.

The Appeals Council incorporated the following additional evidence into the record: (1) a letter from Dennis T. Worley, Claimant's former attorney who represented Claimant during his administrative hearing, dated 11 September 2006 (R. 331-39); (2) progress notes from Richard S. Moore, M.D., of Wilmington Orthopaedic Group, P.A., dated 22 December 2005 and 6 January 2006 (R. 340-41); (3) a progress note from Toni Harris, M.D., of Eastern Carolina Pain Management, dated 22 August 2006 (R. 343-44); (4) progress reports of Becky Currin, R.N.,

8

Claimant's worker's compensation case manager, dated 11 May 2005 to 19 August 2006 (R. 346-73); (5) vocational assessment and employability opinion from Dixon Pearsall, Ph.D., the VE who testified at Claimant's administrative hearing, dated 7 September 2006 (R. 375-78); and (6) information leaflets from The Medicine Mart about Effexor, Hydrocodone, and Topamax (R. 379-83). (R. 9). Although the Appeals Council discounted the additional evidence (R. 7), the Court must review this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y, Health & Human Servs* ., 953 F.2d 93, 96 (4th Cir. 1991) (explaining where the Appeals Council incorporates additional evidence into the administrative record, the reviewing court must "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [ALJ's] findings").[2] However, Claimant bears the burden of demonstrating that the additional evidence is (1) new, i.e., not duplicative or cumulative of that which is already in the record, (2) material, i.e., would have changed the outcome of the ALJ's decision; and (3) relates to the claimant's medical condition as it existed at the time of the hearing. 20 C.F.R. §§ 404.970(b), 416.1470(b); *see Wilkins*, 953 F.2d at 96 (citations omitted); *see also Eason v. Astrue*, No. 2:07-CV-00030-FL, 2008 WL 4108084, at *3 (E.D.N.C. Aug. 29, 2008) (citing *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)). In this case, the relevant time period extends from 16 August 2002 (Claimant's alleged disability onset date) to 13 July 2006 (the date of the ALJ's decision).

---

[2] In his response to Defendant's motion, Claimant contends that "[b]y arguing the factual relevance of the information contained in the Appeals Council Submission before this Court, the Defendant implicitly acknowledges that the Appeals Council Submission should not be reviewed by this Court, but rather should be reviewed by an [ALJ]." Pl.'s Resp. to Def.'s Mot. for J. on the Pleadings at 3. However, consistent with *Wilkins*, this Court must consider the evidence submitted to the Appeals Council in determining whether the ALJ's decision is supported by substantial evidence. *See Wilkins*, 953 F.2d at 96.

Upon review, the Court finds the additional evidence immaterial as it would not have changed the outcome of the ALJ's decision. Claimant visited Dr. Moore on 22 December 2005 for a second opinion regarding his right shoulder. (R. 341). Upon physical examination, Dr. Moore noted Claimant had "a very functional range of motion of the shoulder" and described the shoulder as "stable with no crepitation or mechanical symptoms or apprehension." (R. 341). Dr. Moore noted further that Claimant "had an exceptional functional result" and did not recommend any further surgical intervention on Claimant's shoulder. (R. 340). During Claimant's second, and apparently last visit with Dr. Moore, on 6 January 2006, Dr. Moore noted that a recent x-ray report indicated Claimant's "glenohumeral joint is congruent with minimal degenerative changes" and that the "A.C. joint has some mild subluxation." (R. 340). This evidence supports the ALJ's medical improvement finding as to Claimant's shoulder.

Similarly, the documents from Ms. Currin indicate that Claimant was "doing well physically" (R. 346, 348), "doing well overall" (R. 356-57) and "doing very well" (R. 372-73). Ms. Currin indicated further that acupuncture and physical therapy have decreased Claimant's right shoulder pain. (R. 350, 356-57). During his June and August 2006 visits, Ms. Currin noted that Claimant was quick to anger, did not wish to return to work and if he did return to work, he "expect[ed] [the] same pay with raises, same benefits, etc." (R. 346, 348).

The 22 August 2006 progress note from Dr. Harris is not material as it does not relate to the time period on or before the ALJ's decision. In particular, it provides no information regarding Claimant's medical condition with the exception of Claimant's self-report that his neuropsychologist suggested "an addition of another anti-depressant medication." (R. 343). Rather, Dr. Harris notes only that Claimant was scheduled for a functional capacity evaluation

10

("FCE") on 23 August 2006 to assess his capabilities based on his shoulder injury, he continues to take Effexor, Neurontin and Hydrocodone (also known as Lorcet) and had undergone dental and facial procedures. *Id.* Accompanying Dr. Harris' August 2006 progress note is a one-page note listing fourteen dates on which Claimant visited Dr. Harris' office subsequent to 7 April 2005. (R. 344). However, no information other than these dates has been provided regarding these visits; there is no information as to the reasons for the visits, Dr. Harris' diagnoses or any recommended treatment. Accordingly, the Court is unable to determine whether these records support Claimant's contention that he did not experience medical improvement.

Finally, Mr. Pearsall's vocational assessment, conducted 7 September 2006, and resulting opinion that Claimant is "not employable" is immaterial as it does not contain information from which the ALJ could reasonably have reached a different result had it been before him.[3] Based on an interview with Claimant and the administration of the Kaufman Brief Intelligent Test ("KBIT"), which revealed "below average" or "borderline" intellectual capacity, Dr. Pearsall concluded the "cumulative impact of Mr. Small's medical, physical, intellectual, emotional and adaptive impairments render him 'not employable.'" (R. 378). Dr. Pearsall stated further that he would not recommend vocational rehabilitation as "such activity would likely be unsuccessful and quite possibly detrimental." *Id.*

In rendering his opinion, Dr. Pearsall relied in part on evidence relating to Claimant's cognitive and adaptive functioning during the relevant time period. For example, Dr. Pearsall

---

[3] Regarding the vocational aspects of Claimant's hearing, Dr. Pearsall explained "[i]n review of [my] testimony, it is my opinion that the testimony regarding jobs and appropriateness of these positions is consistent with the hypothetical as proffered by the [ALJ]." (R. 375)

11

referenced (1) the 15 March 2004[4] psychiatric evaluation by Ronald Rosen, M.D., who assigned Claimant a Global Assessment of Functioning ("GAF")[5] score of 40 and (2) Claimant's score on the Wechsler Adult Intelligence Scale ("WAIS"), administered in 2005 during a neuropsychological re-evaluation. (R. 244-45, 307, 376-77). With respect to Dr. Rosen's opinion, however, the ALJ explained that "Dr. Rosen viewed the claimant on only one occasion and treatment records from [Daniel Pistone, M.D.] (who treated the claimant on more than one occasion)[6] for the same date reveal that the claimant did not manifest any significant symptoms or signs of depression or anxiety." (R. 30). The ALJ explained his rationale for discounting Dr. Rosen's opinion and according great weight to that of Dr. Pistone. As for Claimant's WAIS score, Dr. Pearsall noted it was consistent with Claimant's score on the KBIT. However, the test score provides no new insight into Claimant's mental impairment. Indeed, while cognizant of Claimant's poor test results upon neuropsychological evaluation, the ALJ noted that Claimant was able to score in the "average" range overall for memory functioning on two separate occasions. (R. 27, 308-09, 314-15). Accordingly, the ALJ noted specifically in the hypothetical presented to Dr. Pearsall during the administrative hearing that Claimant's RFC must require only "simple, one, two step tasks" and occur in a "low-stress" and "non-production work

---

[4] From the record, it is clear that Dr. Pearsall indicated mistakenly that the evaluation was performed in 2005. *See* (R. 244-45, 377).

[5] The GAF scale ranges from zero to one-hundred and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994). A GAF of 40 indicates "[s]ome impairment in reality testing or communication . . . [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." *Id.*

[6] The medical records show that Claimant saw Dr. Pistone on five occasions between 17 November 2003 and 15 March 2004. (R. 246-53)

Case 7:08-cv-00141-FL    Document 25    Filed 06/11/09    Page 12 of 27

environment." (R. 404). Given Dr. Pearsall's reliance on a test score indicating similar deficiencies as those appearing in the record before the ALJ and a medical opinion discounted by the ALJ, Dr. Pearsall's opinion would not have changed the outcome of the ALJ's decision. For these reasons, the additional evidence submitted by Claimant is not material.

## II. The ALJ's disability determination was supported by substantial evidence of medical improvement.

Claimant contends the ALJ did not have substantial evidence of Claimant's medical improvement as of 7 April 2005. *See* Pl.'s Mem. at 18. In particular, Claimant contends the ALJ erroneously relied on the absence of medical treatment after April 2005 to terminate Claimant's benefits.

A decrease in the medical severity of an impairment sufficient to constitute medical improvement must be substantiated by changes in signs, symptoms, or laboratory findings. 20 C.F.R. § 404.1594(b)(1). To determine whether medical improvement has occurred, the severity of the claimant's current medical condition is compared to the severity of the condition "at the time of the most recent medical decision that [claimant was] were disabled." 20 C.F.R. § 404.1594(b)(1). The date of the most favorable medical decision is called the "point of comparison." 20 C.F.R.§ 404.1594(b)(7). However, when, as here, the ALJ finds that the claimant is disabled for a closed period in the same decision in which he found that a medical improvement occurred, the disability onset date is the "point of comparison." Program Operations Manual System ("POMS") § DI 28010.105(D)(3)(a), available at https://secure.ssa.gov/apps10/poms.nsf/links/0428010105 ("Use onset date as the comparison

13

Case 7:08-cv-00141-FL Document 25 Filed 06/11/09 Page 13 of 27

point.");[7] *see also McDaniel*, 2009 WL 929555, at *5 (citing *Booms v. Comm'r.*, 277 F. Supp. 2d 739, 745 (E.D. Mich. 2003) (finding the ALJ's use of the disability onset date as the comparison point date in a closed period case to be "consistent with 42 U.S.C. § 423(f) and with the Secretary's regulation, 20 C.F.R. § 404.1594")).

The ALJ concluded that Claimant was disabled for the closed period of 16 August 2002 through 6 April 2005. (R. 16). However, the ALJ found medical improvement related to Claimant's ability to work occurred as of 7 April 2005. *Id.* In concluding that medical improvement occurred, the ALJ cited "the passage of time, treatment, surgical intervention, physical therapy, and the use of prescription medications" (R. 23) and Claimant's "limited need or request for medical treatment following 6 April 2005." (R. 24). Upon review of the record for "changes (improvement) in the symptoms, signs and/or laboratory findings associated with [Claimant's] impairment(s)," this Court finds substantial evidence of a "decrease in the medical severity of [Claimant's] impairment(s)." *See* 20 C.F.R. § 404.1594(b)(1).

*A. Improvement in Symptoms*

Symptoms are the claimant's description of impairments. 20 C.F.R. § 404.1528(a). Symptoms of disability may include "pain, fatigue, shortness of break, weakness, or nervousness." 20 C.F.R. § 404.1529. The ALJ discounted Claimant's statements regarding the intensity, persistence and limiting effects of his symptoms in light of the following: (1) inconsistencies between Claimant's statements and medical evidence; (2) inconsistencies between Claimant's testimony as to hi s inability to cook, perform housework or drive and

---

[7] The Court has included, as an attachment, a copy of the cited material as it existed on the website as of the date of the Memorandum and Recommendation.

previous reports to his examining physicians and the SSA to the contrary (R. 29, 238-39, 261, 307); and (3) the absence of significant medical treatment following 6 April 2005 (R. 29).

Regarding inconsistencies between Claimant's statements and the medical evidence, the ALJ noted that Claimant's testimony regarding his delayed task completion and memory problems were belied by evaluations in March 2005 and April 2005. (R. 29). In particular, these evaluations revealed that Claimant had an average memory and that his memory function falls within the normal range when information is presented in an organized manner. (R. 29, 307, 309). The ALJ noted further that findings upon examination failed to support Claimant's testimony regarding his anger, citing in particular Claimant's lack of "legal difficulties or any additional problems dealing with any of his treating or examining physicians following the commencement of his use of Effexor." (R. 29, 322, 325). The ALJ cited the lack of evidence supporting Claimant's testimony that he suffered from medication side effects, including blurred vision and drowsiness. (R. 29). The ALJ noted also that "physical examination has failed to reveal any significant muscle atrophy or motor loss, which one would expect" given Claimant testified to staying in bed for most of the day. (R. 29, 395). Finally, the ALJ explained that Claimant "did not apparently complain to any of his treating or examining physicians of [his right shoulder "locking up"] following his arthroscopic surgery and physical therapy," noting in particular Claimant's statement on 25 March 2005 that "he could 'live' with his shoulder limitations." (R. 29, 320)

The ALJ relied also on the lack of medical records subsequent to April 2005. (R. 25, 29). The administrative hearing was held on 19 May 2005, after which the record closed. *See* (R. 387) (explaining during hearing that he [ALJ] will issue instructions as to his decision to his

15

paralegal that same day). To the extent the ALJ's determination was based on a lack of records, Claimant asserts that the ALJ had a duty to further supplement the record. *See* Pl.'s Mem. at 19-20.

First, the Court notes that the ALJ cited ample medical evidence in reaching his decision. Nonetheless, Claimant asserts that the ALJ had a duty to further supplement the record. *See* Pl.'s Mem. at 19-20 (citing *Jernigan v. Astrue*, No. 7:07-CV-201-BO, 2008 WL 4772202, at *2 (E.D.N.C. Oct. 28, 2008)). To this end, Claimant later submitted the above-summarized additional evidence to the Appeals Council after the ALJ had issued his decision. Claimant provided little argument as to how these medical reports should have affected the ALJ's assessment. As explained above, the evidence supports the ALJ's assertion that Claimant "has not apparently required any *significant* medical treatment" subsequent to 6 April 2005. (R. 29) (emphasis added). Moreover, to the extent Claimant relies on *Jernigan*, his reliance is misplaced. *Jernigan* deals with an extreme instance where the ALJ completely failed to explore all relevant facts and inquire into the issues necessary to develop the record. In particular, the court noted that the ALJ disregarded a treating physician's opinion for lack of supporting evidence in direct contravention of regulations providing that an ALJ has a duty to contact a treating physician when the evidence therefrom is deemed inadequate. *See Jernigan*, 2008 WL 4772202, at *2 (citing 20 C.F.R. § 404.1512(e)). Regardless, "[a]lthough the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, . . . [the ALJ] is not required to function as the claimant's substitute counsel . . . ." *Bell v. Chater*, 1995 WL 347142, at *4 (4th Cir. Jun. 9, 1995) (unpublished opinion) (citing *Clark v. Shalala*, 28 F.3d 828, 830-831 (8th Cir. 1994)) (internal citations and quotations omitted).

16

Ultimately, Claimant carries the burden of establishing a prima facie entitlement to benefits and bears the risk of nonpersuasion. *Id.* Here, the ALJ asked appropriate questions and obtained sufficient evidence from which a reasoned conclusion could be drawn. This Court finds that the record before the ALJ contained substantial evidence of improvement in the symptoms of Claimant's impairments as of 7 April 2005.

## B. *Improvement in the Signs associated with the impairments*

Medical improvement may also be demonstrated by a decrease in the medical severity of an impairment as shown by changes in the signs associated with the impairment. 20 C.F.R. § 404.1594(b)(1). "Signs" are "anatomical, physiological, or psychological abnormalities which can be observed, apart from [a claimant's] statements (symptoms)." 20 C.F.R. § 404.1528(b). "Signs must be shown by medically acceptable clinical diagnostic techniques." *Id.*

With respect to Claimant's physical impairments, the ALJ relied on the medical evidence demonstrating a continued improvement in Claimant's condition with the passage of time. The ALJ noted that in October 2003, Claimant underwent a functional capacity evaluation ("FCE") which indicated Claimant was capable of performing work at the medium level. (R. 23, 195). The ALJ acknowledged, however, that Claimant demonstrated consistent antalgia and a slow paced gait and was limited with tasks requiring mobility, quick movements with his right shoulder and forceful grasping with his right hand. (R. 23, 197). The ALJ noted further that as a result of Claimant's ankle injury, he experienced limitations with activities requiring prolonged walking or walking and carrying weight due to poor weight bearing tolerance. (R. 23-24, 197). However, the ALJ noted that Claimant's physical condition improved as evidenced by (1) a November 2003 consultative exam indicating that Claimant (a) ambulated without difficulty and

17

without any gait abnormalities; (b) stood on his heels and toes and had minimal difficulty only with squatting, rising and tandem walking; and (c) 5/5 grip strength (R. 24, 26, 262-63); (2) a July 2004 physical examination which indicated Claimant's "motor exam is grossly within normal limits" (R. 24, 328); (3) a March 2005 and April 2005 dexterity examination indicating average performance for both hands which the evaluator characterized as "significant improvement since [Claimant's] previous evaluation" and a notation that Claimant is engaging in activities such as guitar lessons. (R. 26, 307). Despite improvements noted in Claimant's medical records and the October 2003 evaluation indicating Claimant was capable of performing medium work, the ALJ limited Claimant to light work because "the medical evidence demonstrated that while [] [C]laimant's shoulder condition did improve following surgery and physical therapy, continued dysfunction remained." (R. 26, 262). This Court finds that the record before the ALJ contained substantial evidence of improvement in the signs associated with Claimant's impairments as of 7 April 2005.

## C. *Improvement in Laboratory Findings*

Finally, medical improvement may also be demonstrated by a decrease in the medical severity of an impairment as shown by changes in the laboratory findings associated with the impairment. 20 C.F.R. § 404.1594(b)(1). "Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests."

18

In finding Claimant experienced medical improvement with respect to mental impairments, the ALJ noted that with medication, and in particular, the use of Effexor, Claimant's mental impairment improved. Indeed, in December 2004, Claimant's pain management physician, Toni Harris, M.D., noted Claimant appeared "calmer" (R. 27, 322) and during a neuropsychological evaluation in March 2005, Christy Jones, Ph.D. noted Claimant "responded well" to Effexor. (R. 27, 306). The ALJ noted further that by early 2005, Claimant's "[m]emory testing was found to be in the average range and . . . [he] did not demonstrate any significant constructional difficulties." (R. 27, 308-09).

In evaluating Claimant's mental impairment, the ALJ noted contradictory evidence among medical providers and explained his reasoning for crediting certain evidence while discrediting other evidence. In particular, Dr. Pistone, who began treating Claimant in November 2003, remarked in a 15 March 2004 progress note that Claimant did not have "any significant symptoms, neither by affect, vegetative functioning or by cognitive content of a depression or anxiety." (R. 26, 246). However, Dr. Rosen, who evaluated Claimant also on 15 March 2004, found that Claimant had a GAF score of 40, indicating major impairment in several areas. (R. 30, 244). Likewise, Dr. Jones found "moderate degrees of rating scales of depression and anxiety" during the same time period. (R. 246, 315).

With respect to Dr. Rosen's opinion, the ALJ noted that he "viewed the claimant on only one occasion and treatment records from Dr. Pistone (who treated the claimant on more than one occasion) for the same date reveal that the claimant did not manifest any significant symptoms or signs of depression or anxiety." (R. 30). Accordingly, the ALJ assigned little weight to Dr.

Rosen's opinion, concluding it was based primarily upon the claimant's subjective complaints and not the objective medical evidence. (R. 27, 30).

Similarly, in affording minimal weight to the opinion of Dr. Jones, the ALJ noted that she did not have a longitudinal treating relationship with Claimant. (R. 31, 306-10, 312-16). The ALJ noted further that during her February 2004 evaluation of Claimant, Dr. Jones failed to find that Claimant suffered from "such extreme limitations in functioning" as stated in Dr. Jones' April 2005 evaluation of Claimant. (R. 31). In April 2005, Dr. Jones reported that Claimant's frontal lobe dysfunction interfered "with almost all of his social interactions, ability to manage his finances, and other deficits in terms of disinhibition as well as planning and organizing" and that Claimant's "behavioral changes (anger, impulsivity and poor social skills) will make it dangerous to be employed in any job in which he would have to interact with people." (R. 30, 309). In discrediting that statement, the ALJ noted that Claimant's anger and irritability were "under much better control with the use of Effexor." (R. 31). The ALJ noted further that in February 2004, Dr. Jones found that Claimant had average attention and concentration with only moderate depression and a moderate traumatic brain injury with recovery of many functions. (R. 31, 315). The ALJ acknowledged also Dr. Jones' February 2004 opinion that Claimant "will likely be able to perform a job that met the cognitive demands of his previous job once the psychiatric distress is successfully treated[;] [h]owever, . . . he will never be able to maintain employment that requires anything beyond a repetitive, blue collar position" (R. 315), which, as the ALJ concluded, indicates Claimant could perform some work activity. (R. 31). Finally, the ALJ explained that Claimant "has been able to engage in a wide range of activities of daily living despite his mental health condition and low intellectual functioning."

20

The ALJ discussed also the results of the various tests administered by Dr. Jones. (R. 27). While acknowledging that various tests "revealed severe deficits across many domains of frontal lobe functioning," the ALJ found Claimant capable of performing "simple, 1 to 2 step tasks" in a non-production work environment that does not require any public contact or more than occasional contact with co-workers. (R. 27, 307, 314). The ALJ supported this finding based on Claimant's ability to engage in a significant range of activities of daily living, including cooking, cleaning, driving and shopping. (R. 27). The ALJ noted further that "[t]here is no evidence to show that the claimant required or received any additional neuropscyhological (sic) intervention, despite Dr. Jones' direction that the claimant receive such services on a monthly basis. (R. 27, 309). This Court finds that the record before the ALJ contained substantial evidence of improvement in the laboratory findings associated with Claimant's impairments as of 7 April 2005.

## III.    The ALJ properly relied on the testimony of the vocational expert.

Claimant contends the ALJ committed error by improperly relying on VE testimony. Pl.'s Mem. at 24. Specifically, Claimant argues that the hypothetical posed to the VE did not adequately reflect Claimant's RFC in that it did not include Claimant's behavioral limitations (anger, impulsivity and poor social skills) as noted by Dr. Jones. *Id.* For the following reasons, this Court finds Claimant's argument to be unpersuasive.

The purpose of a VE is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). As such, hypothetical questions posed to a VE must accurately set forth all of a claimant's physical and mental impairments. *Id.* "Testimony elicited by hypothetical

21

questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision." *Pratt v. Sullivan*, 956 F.2d 830, 836 (8th Cir. 1992). The corollary to this rule is that the ALJ need only include in his questioning those impairments which the ALJ has found to be credible. *Ehrhart v. Sec'y, Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992) (noting "the hypothetical question posed by the ALJ was proper because it reflected [claimant's] impairments to the extent that the ALJ found them supported by evidence in the record."); *Norris v. Astrue*, No. 7:07-CV-184-FL, 2008 WL 4911794, at *5 (E.D.N.C. Nov. 14, 2008). If the ALJ does not believe that a claimant suffers from one or more claimed impairments, and substantial evidence supports that conclusion, then the ALJ does not err if he fails to include those impairments in his questioning of the VE. *Sobania v. Sec'y, Health & Human Servs.*, 879 F.2d 441 (8th Cir. 1989) (explaining "the hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ").

In this case, the hypothetical posed to the VE incorporated Claimant's RFC as determined by the ALJ and the ALJ precisely set out Claimant's individual physical and mental impairments. (R. 472); *see Walker*, 889 F.2d at 50. While Claimant contends that the ALJ should have included additional limitations noted by Dr. Jones in the hypothetical, the ALJ's determination that Claimant was restricted by only those limitations that are reflected in the hypothetical is supported by substantial evidence. *See Norris*, 2008 WL 4911794, at *5 (expl aining "the hypothetical need not reflect all of the opinions of examiners and consulting doctors"). As discussed previously, the ALJ's decision to accord little weight to the opinion of Dr. Jones is supported by substantial evidence. Accordingly, Claimant's argument as to this issue is without merit.

## CONCLUSION

For the reasons stated above, this Court RECOMMENDS Claimant's Motion for Judgment on the Pleadings be DENIED, Defendant's Motion for Judgment on the Pleadings be GRANTED and the final decision of the Commissioner be UPHELD.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This, the 10th day of June, 2009.

Robert B. Jones, Jr.
United States Magistrate Judge

23

# POMS Section DI 28010.105

**TN 1 (04-00)**

# DI 28010.105 Comparison Point Decision

## A. POLICY - GENERAL

**(Secs. 404.1594(b)(7), 416.994(b)(1)(vii), 416.994a(c)(1))**

The CPD is the **most recent favorable decision** that the individual was disabled or continued to be disabled.

The most recent favorable decision is the latest final determination or decision involving a consideration of the medical evidence and whether you were disabled or continued to be disabled. (Sec. 416.994a(c) (1))

**NOTE:** The wording concerning the most recent favorable decision in the three relevant sections of the regulations is slightly different, but the substance and intent is the same.

## B. POLICY - "MODIFIED DETERMINATION"

**Effect of "Modified Determination**

### 1. Childhood Modified Determinations

Pursuant to P.L. 104-193, enacted August 22, 1996, some title XVI child cases were identified as potentially requiring a disability redetermination (see DI 25299.001 ff.). To avoid inappropriate redeterminations, the DDS first reviewed the prior file to decide if the case actually belonged in the disability redetermination workload. If not, the DDS prepared a "modified determination" SSA-832 to show that a disability redetermination was unnecessary -- see DI 23570.025C.

These "modified determination" SSA-832s are based on the evidence from the time of the prior determination, **and that evidence remains the CPD evidence for the next CDR**. The relevance of the "modified determination" SSA-832 to the CDR is that the **basis** for the CPD may have been changed (e.g., from an IFA allowance to a listing-level allowance, or from one listing to another), and this may affect consideration at the "prior listing still met/equaled?" step for title XVI children.

### 2. No "Modified Determination" Issue in Adult Cases

Individuals on the rolls as title XVI children must have their disability redetermined under the adult rules (except the SGA rules) upon attainment of age 18. The age-18 disability redetermination is the CPD for the next CDR, so that all prior determinations, including any "modified determination," are irrelevant for CDR purposes. See DI 28005.003 if a title XVI adult originally allowed as a child has not had an age-18 disability redetermination.

# C. PROCEDURE

**Modified Determination Following CPD**

In performing a subsequent CDR in a title XVI child case with a "modified determination" :

- Consider whether there has been MI by comparing current evidence to the CPD evidence (the modified determination has **no effect**on this step).

- If there has been MI, next consider whether the child's CPD impairment(s) **as shown on the modified determination SSA-832**still meets, or medically or functionally equals the severity of the listing **shown on the modified determination SSA-832**.

- If the impairment(s) does not still meet or equal the severity of the listing shown on the modified determination SSA-832, then consider whether the child is currently disabled, as in any other CDR case.

**EXAMPLE:** A title XVI child's case was identified as potentially requiring a disability redetermination in 1997 because the claim had been allowed based on an individualized functional assessment (IFA) in June 1993. Upon review of the evidence in file from June 1993, the DDS found that the child's impairment(s) actually met a listing at that time, and that a disability redetermination was therefore not required.

A modified determination SSA-832 was prepared in July, 1997, showing that the proper basis for the 1993 allowance was that the child's impairment(s) met a listing, and that a disability redetermination was not required.

In performing a subsequent CDR on this child, the DDS would first consider whether there has been MI by comparing current evidence to the CPD evidence from 1993. If there has been MI, the DDS would next consider whether the child's CPD impairment(s)**as shown on the modified determination SSA-832** would still meet, or medically or functionally equal the severity of the listing **shown on the modified determination SSA-832.**If not, the DDS would then consider whether the child is currently disabled.

# D. POLICY - WHICH DECISIONS ARE CPD's

## 1. CPD? - No

The following types of decisions do not involve development of current medical evidence and/or consideration of medical issues. Such decisions and their supporting evidence do not provide a suitable basis for MIRS comparisons. Therefore, do not use as CPDs:

- Adoption decisions without development of the level of current medical evidence needed for a "regular" disability decision (DI 22501.001 ff., DI 28030.020),

- Curtailed development,

- SSA-899-U2's categorizing individuals as permanently impaired, without evaluation of then-current medical evidence,

- Reinstatement under CDR moratorium,

- Decisions based solely on work,

- Decisions not involving consideration of the issue of current disability (e.g., most decisions on appeals requesting an earlier onset).

## 2. CPD? - Yes

Use the following types of decisions as CPDs when they meet the criteria in DI 28010.105A. (Also see DI 28040.125B.1. and DI 28040.200):

- Decisions (based on then-current medical evidence) that the individual continues to have a disabling impairment (DI 28055.045),
- Adoption decisions which included development of the usual level of current medical evidence and consideration of medical, medical/vocational, and/or medical/functional issues, and
- The earlier medical decision (usually under a different title) used as the basic for an adoption decision (i.c., without medical evidence at the time of adoption).

## 3. Closed Period

### a. General

Use onset date as the comparison point. (DI 25510.001 ff. discusses closed period cases.)

### b. Adoption Decision

When this results in a closed period decisions on a new claim and simultaneous cessation of benefits on a previously adjudicated claim, use the prior medical decision on the previously adjudicated claim as the CPD for both decisions.

## 4. Nonrollback Conversion

### a. Comparison Points

Two comparison points may apply. DI 28075.200D. discusses evaluation criteria for these cases. DI 28035.025 discusses additional considerations related to comparison points in nonrollback conversion cases where evidence from the prior state decision is not available and cannot be reconstructed.

### b. Federal Criteria

Use the most recent favorable decision under the Federal criteria as the CPD, as discussed above. If there is no prior favorable Federal decision, use the most recent medical decision granting or affirming entitlement under the State criteria as the CPD.

### c. State Criteria

In considering State criteria, use the most recent medical decision granting or affirming entitlement under the State criteria as the CPD.

To Link to this section - Use this URL:
http:/policy.ssa.gov/poms.nsf/links/0428010105

Case 7:08-cv-00141-FL　Document 25　Filed 06/11/09　Page 26 of 27

USA.gov      Privacy Policy | Website Policies & Other Important Information